Justice Stevens,
with whom
Justice Ginsburg joins except as to Part IV, dissenting.
In the first paragraph of its 23-page opinion the Court states that the question to be decided is whether allegations that “major telecommunications providers engaged in certain *571 parallel conduct unfavorable to competition” suffice to state a violation of § 1 of the Sherman Act. Ante, at 548-549. The answer to that question has been settled for more than 50 years. If that were indeed the issue, a summary reversal citing Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U. S. 537 (1954), would adequately resolve this case. As Theatre Enterprises held, parallel conduct is circumstantial evidence admissible on the issue of conspiracy, but it is not itself illegal. Id., at 540-542.
Thus, this is a case in which there is no dispute about the substantive law. If the defendants acted independently, their conduct was perfectly lawful. If, however, that conduct is the product of a horizontal agreement among potential competitors, it was unlawful. The plaintiffs have alleged such an agreement and, because the complaint was dismissed in advance of answer, the allegation has not even been denied. Why, then, does the case not proceed? Does a judicial opinion that the charge is not “plausible” provide a legally acceptable reason for dismissing the complaint? I think not.
Respondents’ amended complaint describes a variety of circumstantial evidence and makes the straightforward allegation that petitioners
“entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another.” Amended Complaint in No. 02 CIV. 10220 (GEL) (SDNY) ¶ 51, App. 27 (hereinafter Complaint).
The complaint explains that, contrary to Congress’ expectation when it enacted the 1996 Telecommunications Act, and consistent with their own economic self-interests, petitioner Incumbent Local Exchange Carriers (ILECs) have assiduously avoided infringing upon each other’s markets and have *572 refused to permit nonincumbent competitors to access their networks. The complaint quotes Richard Notebaert, the former chief executive officer of one such ILEC, as saying that competing in a neighboring ILEC’s territory “ ‘might be a good way to turn a quick dollar but that doesn’t make it right.’” Id., ¶42, App. 22. Moreover, respondents allege that petitioners “communicate amongst themselves” through numerous industry associations. Id., ¶ 46, App. 23. In sum, respondents allege that petitioners entered into an agreement that has long been recognized as a classic per se violation of the Sherman Act. See Report of the Attorney General’s National Committee to Study the Antitrust Laws 26 (1955).
Under rules of procedure that have been well settled since well before our decision in Theatre Enterprises, a judge ruling on a defendant’s motion to dismiss a complaint “must accept as true all of the factual allegations contained in the complaint.” Swierkiewicz v. Sorema N. A., 534 U. S. 506, 508, n. 1 (2002); see Overstreet v. North Shore Corp., 318 U. S. 125,127 (1943). But instead of requiring knowledgeable executives such as Notebaert to respond to these allegations by way of sworn depositions or other limited discovery — and indeed without so much as requiring petitioners to file an answer denying that they entered into any agreement — the majority permits immediate dismissal based on the assurances of company lawyers that nothing untoward was afoot. The Court embraces the argument of those lawyers that “there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway,” ante, at 566; that “there was just no need for joint encouragement to resist the 1996 Act,” ibid.; and that the “natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing,” ante, at 568.
The Court and petitioners’ legal team are no doubt correct that the parallel conduct alleged is consistent with the ab *573 sence of any contract, combination, or conspiracy. But that conduct is also entirely consistent with the presence of the illegal agreement alleged in the complaint. And the charge that petitioners “agreed not to compete with one another” is not just one of “a few stray statements,” ante, at 564; it is an allegation describing unlawful conduct. As such, the Federal Rules of Civil Procedure, our longstanding precedent, and sound practice mandate that the District Court at least require some sort of response from petitioners before dismissing the case.
Two practical concerns presumably explain the Court’s dramatic departure from settled procedural law. Private antitrust litigation can be enormously expensive, and there is a risk that jurors may mistakenly conclude that evidence of parallel conduct has proved that the parties acted pursuant to an agreement when they in fact merely made similar independent decisions. Those concerns merit careful case management, including strict control of discovery, careful scrutiny of evidence at the summary judgment stage, and lucid instructions to juries; they do not, however, justify the dismissal of an adequately pleaded complaint without even requiring the defendants to file answers denying a charge that they in fact engaged in collective decisionmaking. More importantly, they do not justify an interpretation of Federal Rule of Civil Procedure 12(b)(6) that seems to be driven by the majority’s appraisal of the plausibility of the ultimate factual allegation rather than its legal sufficiency.
I
Rule 8(a)(2) of the Federal Rules requires that a complaint contain “a short and plain statement of the claim showing that the pleader is entitled to relief.” The Rule did not come about by happenstance, and its language is not inadvertent. The English experience with Byzantine special pleading rules — illustrated by the hypertechnical Hilary rules of *574 1834[1] — made obvious the appeal of a pleading standard that was easy for the common litigant to understand and sufficed to put the defendant on notice as to the nature of the claim against him and the relief sought. Stateside, David Dudley Field developed the highly influential New York Code of 1848, which required “[a] statement of the facts constituting the cause of action, in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended.” An Act to Simplify and Abridge the Practice, Pleadings and Proceedings of the Courts of this State, ch. 379, § 120(2), 1848 N. Y. Laws pp. 497, 521. Substantially similar language appeared in the Federal Equity Rules adopted in 1912. See Fed. Equity Rule 25 (requiring “a short and simple statement of the ultimate facts upon which the plaintiff asks relief, omitting any mere statement of evidence”).
A difficulty arose, however, in that the Field Code and its progeny required a plaintiff to plead “facts” rather than “conclusions,” a distinction that proved far easier to say than to apply. As commentators have noted,
“it is virtually impossible logically to distinguish among ‘ultimate facts,’ ‘evidence,’ and ‘conclusions.’ Essentially any allegation in a pleading must be an assertion that certain occurrences took place. The pleading spectrum, passing from evidence through ultimate facts to conclusions, is largely a continuum varying only in the degree of particularity with which the occurrences are described.” Weinstein & Distler, Comments on Procedural Reform: Drafting Pleading Rules, 57 Colum. L. Rev. 518, 520-521 (1957).
See also Cook, Statements of Fact in Pleading Under the Codes, 21 Colum. L. Rev. 416, 417 (1921) (hereinafter Cook) (“[T]here is no logical distinction between statements which are grouped by the courts under the phrases ‘statements of *575 fact’ and ‘conclusions of law’ ”). Rule 8 was directly responsive to this difficulty. Its drafters intentionally avoided any reference to “facts” or “evidence” or “conclusions.” See 5 C. Wright & A. Miller, Federal Practice and Procedure §1216, p. 207 (3d ed. 2004) (hereinafter Wright & Miller) (“The substitution of ‘claim showing that the pleader is entitled to relief’ for the code formulation of the ‘facts’ constituting a ‘cause of action’ was intended to avoid the distinctions drawn under the codes among ‘evidentiary facts,’ ‘ultimate facts,’ and ‘conclusions’... ”).
Under the relaxed pleading standards of the Federal Rules, the idea was not to keep litigants out of court but rather to keep them in. The merits of a claim would be sorted out during a flexible pretrial process and, as appropriate, through the crucible of trial. See Swierkiewicz, 534 U. S., at 514 (“The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim”). Charles E. Clark, the “principal draftsman” of the Federal Rules,[2] put it thus:
“Experience has shown ... that we cannot expect the proof of the case to be made through the pleadings, and that such proof is really not their function. We can expect a general statement distinguishing the case from all others, so that the manner and form of trial and remedy expected are clear, and so that a permanent judgment will result.” The New Federal Rules of Civil Procedure: The Last Phase — Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure, 23 A. B. A. J. 976, 977 (1937) (hereinafter Clark, New Federal Rules).
The pleading paradigm under the new Federal Rules was well illustrated by the inclusion in the appendix of Form 9, *576 a complaint for negligence. As relevant, the Form 9 complaint states only: “On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then crossing said highway.” Form 9, Complaint for Negligence, Forms App., Fed. Rules Civ. Proc., 28 U. S. C. App., p. 829 (hereinafter Form 9). The complaint then describes the plaintiff’s injuries and demands judgment. The asserted ground for relief — namely, the defendant’s negligent driving — would have been called a “‘conclusion of law’” under the code pleading of old. See, e. g., Cook 419. But that bare allegation suffices under a system that “restrict[s] the pleadings to the task of general notice-giving and investís] the deposition-discovery process with a vital role in the preparation for trial.”[3] Hickman v. Taylor, 329 U. S. 495, 501 (1947); see also Swierkiewicz, 534 U. S., at 513, n. 4 (citing Form 9 as an example of “ ‘the simplicity and brevity of statement which the rules contemplate’”); Thomson v. Washington, 362 F. 3d 969, 970 (CA7 2004) (Posner, J.) (“The federal rules replaced fact pleading with notice pleading”).
II
It is in the context of this history that Conley v. Gibson, 355 U. S. 41 (1957), must be understood. The Conley plaintiffs were black railroad workers who alleged that their union local had refused to protect them against discriminatory discharges, in violation of the National Railway Labor Act. The union sought to dismiss the complaint on the ground that its general allegations of discriminatory treatment by the defendants lacked sufficient specificity. Writing *577 for a unanimous Court, Justice Black rejected the union’s claim as foreclosed by the language of Rule 8. Id., at 47-48. In the course of doing so, he articulated the formulation the Court rejects today: “In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Id., at 45-46.
Consistent with the design of the Federal Rules, Conley's “no set of facts” formulation permits outright dismissal only when proceeding to discovery or beyond would be futile. Once it is clear that a plaintiff has stated a claim that, if true, would entitle him to relief, matters of proof are appropriately relegated to other stages of the trial process. Today, however, in its explanation of a decision to dismiss a complaint that it regards as a fishing expedition, the Court scraps Conley's “no set of facts” language. Concluding that the phrase has been “questioned, criticized, and explained away long enough,” ante, at 562, the Court dismisses it as careless composition.
If Conley's “no set of facts” language is to be interred, let it not be without a eulogy. That exact language, which the majority says has “puzzl[ed] the profession for 50 years,” ante, at 563, has been cited as authority in a dozen opinions of this Court and four separate writings.[4] In not one of *578 those 16 opinions was the language “questioned,” “criticized,” or “explained away.” Indeed, today’s opinion is the first by any Member of this Court to express any doubt as to the adequacy of the Conley formulation. Taking their cues from the federal courts, 26 States and the District of Columbia utilize as their standard for dismissal of a complaint the very language the majority repudiates: whether it appears “beyond doubt” that “no set of facts” in support of the claim would entitle the plaintiff to relief.[5]
*579 Petitioners have not requested that the Conley formulation be retired, nor have any of the six amici who filed briefs in support of petitioners. I would not rewrite the Nation’s civil procedure textbooks and call into doubt the pleading rules of most of its States without far more informed deliberation as to the costs of doing so. Congress has established a process — a rulemaking process — for revisions of that order. See 28 U. S. C. §§2072-2074 (2000 ed. and Supp. IV).
Today’s majority calls Conley’s “ ‘no set of facts’ ” language “an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be *580 supported by showing any set of facts consistent with the allegations in the complaint.” Ante, at 563. This is not and cannot be what the Conley Court meant. First, as I have explained, and as the Conley Court well knew, the pleading standard the Federal Rules meant to codify does not require, or even invite, the pleading of facts.[6] The “pleading standard” label the majority gives to what it reads into the Conley opinion — a statement of the permissible factual support for an adequately pleaded complaint — would not, therefore, have impressed the Conley Court itself. Rather, that Court would have understood the majority’s remodeling of its language to express an evidentiary standard, which the Conley Court had neither need nor want to explicate. Second, it is pellueidly clear that the Conley Court was interested in what a complaint must contain, not what it may contain. In fact, the Court said without qualification that it was “appraising the sufficiency of the complaint.” 355 U. S., at 45 (emphasis added). It was, to paraphrase today’s májority, describing “the minimum standard of adequate pleading to govern a complaint’s survival,” ante, at 563.
We can be triply sure as to Conley’s meaning by examining the three Court of Appeals cases the Conley Court cited as support for the “accepted rule” that “a complaint should not *581 be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” 355 U. S., at 45-46. In the first case, Leimer v. State Mut. Life Assurance Co. of Worcester, Mass., 108 F. 2d 302 (CA8 1940), the plaintiff alleged that she was the beneficiary of a life insurance plan and that the insurance company was wrongfully withholding proceeds from her. In reversing the District Court’s grant of the defendant’s motion to dismiss, the Eighth Circuit noted that court’s own longstanding rule that, to warrant dismissal, “ ‘it should appear from the allegations that a cause of action does not exist, rather than that a cause of action has been defectively stated.’” Id., at 305 (quoting Winget v. Rockwood, 69 F. 2d 326, 329 (CA8 1934)).
The Leimer court viewed the Federal Rules — specifically Rules 8(a)(2), 12(b)(6), 12(e) (motion for a more definite statement), and 56 (motion for summary judgment) — as reinforcing the notion that “there is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of the claim.” 108 F. 2d, at 306. The court refuted in the strongest terms any suggestion that the unlikelihood of recovery should determine the fate of a complaint: “No matter how improbable it may be that she can prove her claim, she is entitled to an opportunity to make the attempt, and is not required to accept as final a determination of her rights based upon inferences drawn in favor of the defendant from her amended complaint.” Ibid.
The Third Circuit relied on Leimer’s admonition in Continental Collieries, Inc. v. Shober, 130 F. 2d 631 (1942), which the Conley Court also cited in support of its “no set of facts” formulation. In a diversity action the plaintiff alleged breaeh of contract, but the District Court dismissed the complaint on the ground that the contract appeared to be unenforceable under state law. The Court of Appeals reversed, *582 concluding that there were facts in dispute that went to the enforceability of the contract, and that the rule at the pleading stage was as in Leimer: “No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it.” 130 F. 3d, at 635.
The third case the Conley Court cited approvingly was written by Judge Clark himself. In Dioguardi v. Durning, 139 F. 2d 774 (CA2 1944), the pro se plaintiff, an importer of “tonics,” charged the customs inspector with auctioning off the plaintiff’s former merchandise for less than was bid for it — and indeed for an amount equal to the plaintiff’s own bid — and complained that two cases of tonics went missing three weeks before the sale. The inference, hinted at by the averments but never stated in so many words, was that the defendant fraudulently denied the plaintiff his rightful claim to the tonics, which, if true, would have violated federal law. Writing six years after the adoption of the Federal Rules he held the lead rein in drafting, Judge Clark said that the defendant
“could have disclosed the facts from his point of view, in advance of a trial if he chose, by asking for a pre-trial hearing or by moving for a summary judgment with supporting affidavits. But, as it stands, we do not see how the plaintiff may properly be deprived of his day in court to show what he obviously so firmly believes and what for present purposes defendant must be taken as admitting.” Id., at 775.
As any civil procedure student knows, Judge Clark’s opinion disquieted the defense bar and gave rise to a movement to revise Rule 8 to require a plaintiff to plead a “ ‘cause of action.’ ” See 5 Wright & Miller § 1201, at 86-87. The movement failed, see ibid.; Dioguardi was explicitly approved in Conley; and “[i]n retrospect the case itself seems to be a *583 routine application of principles that are universally accepted,” 5 Wright & Miller § 1220, at 284-285.
In light of Leimer, Continental Collieries, and Dioguardi, Conley’s statement that a complaint is not to be dismissed unless “no set of facts” in support thereof would entitle the plaintiff to relief is hardly “puzzling,” ante, at 562-563. It reflects a philosophy that, unlike in the days of code pleading, separating the wheat from the chaff is a task assigned to the pretrial and trial process. Conley’s language, in short, captures the policy choice embodied in the Federal Rules and binding on the federal courts.
We have consistently reaffirmed that basic understanding of the Federal Rules in the half century since Conley. For example, in Scheuer v. Rhodes, 416 U. S. 232 (1974), we reversed the Court of Appeals’ dismissal on the pleadings when the respondents, the Governor and other officials of the State of Ohio, argued that the petitioners’ claims were barred by sovereign immunity. In a unanimous opinion by then-justice Rehnquist, we emphasized:
“When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.’’ Id., at 236 (emphasis added).
The Rhodes plaintiffs had “alleged generally and in conclusory terms” that the defendants, by calling out the National Guard to suppress the Kent State University student protests, “were guilty of wanton, wilful and negligent conduct.” Krause v. Rhodes, 471 F. 2d 430, 433 (CA6 1972). We reversed the Court of Appeals on the ground that “[w]hatever *584 the plaintiffs may or may not be able to establish as to the merits of their allegations, their claims, as stated in the complaints, given the favorable reading required by the Federal Rules of Civil Procedure,” were not barred by the Eleventh Amendment because they were styled as suits against the defendants in their individual capacities. 416 U. S., at 238.
We again spoke with one voice against efforts to expand pleading requirements beyond their appointed limits in Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U. S. 163 (1993). Writing for the unanimous Court, Chief Justice Rehnquist rebuffed the Fifth Circuit’s effort to craft a standard for pleading municipal liability that accounted for “the enormous expense involved today in litigation,” Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 954 F. 2d 1054, 1057 (1992) (internal quotation marks omitted), by requiring a plaintiff to “state with factual detail and particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity,” 507 U. S., at 167 (internal quotation marks omitted). We found this language inconsistent with Rules 8(a)(2) and 9(b) and emphasized that motions to dismiss were not the place to combat discovery abuse: “In the absence of [an amendment to Rule 9(b)], federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later.” Id., at 168-169.
Most recently, in Swierkiewicz, 534 U. S. 506, we were faced with a case more similar to the present one than the majority will allow. In discrimination cases, our precedents require a plaintiff at the summary judgment stage to produce either direct evidence of discrimination or, if the claim is based primarily on circumstantial evidence, to meet the shifting evidentiary burdens imposed under the framework articulated in McDonnell Douglas Corp. v. Green, 411 U. S. 792 (1973). See, e. g., Trans World Airlines, Inc. v. Thur *585 ston, 469 U. S. 111, 121 (1985). Swierkiewicz alleged that he had been terminated on account of national origin in violation of Title VII of the Civil Rights Act of 1964. The Second Circuit dismissed the suit on the pleadings because he had not pleaded a prima facie case of discrimination under the McDonnell Douglas standard.
We reversed in another unanimous opinion, holding that “under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the McDonnell Douglas framework does not apply in every employment discrimination case.” Swierkiewicz, 534 U. S., at 511. We also observed that Rule 8(a)(2) does not contemplate a court’s passing on the merits of a litigant’s claim at the pleading stage. Rather, the “simplified notice pleading standard” of the Federal Rules “relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.” Id., at 512; see Brief for United States et al. as Amici Curiae in Swierkiewicz v. Sorema N. A, O. T. 2001, No. 00-1853, p. 10 (stating that a Rule 12(b)(6) motion is not “an appropriate device for testing the truth of what is asserted or for determining whether a plaintiff has any evidence to back up what is in the complaint” (internal quotation marks omitted)).[7]
As in the discrimination context, we have developed an evidentiary framework for evaluating claims under § 1 of the Sherman Act when those claims rest on entirely circumstantial evidence of conspiracy. See Matsushita Elec. Indus *586 trial Co. v. Zenith Radio Corp., 475 U. S. 574 (1986). Under Matsushita, a plaintiff’s allegations of an illegal conspiracy may not, at the summary judgment stage, rest solely on the inferences that may be drawn from the parallel conduct of the defendants. In order to survive a Rule 56 motion, a § 1 plaintiff “must present evidence ‘that tends to exclude the possibility’ that the alleged conspirators acted independently.’” Id., at 588 (quoting Monsanto Co. v. Spray-Rite Service Corp., 465 U. S. 752, 764 (1984)). That is, the plaintiff “must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action.” 475 U. S., at 588.
Everything today’s majority says would therefore make perfect sense if it were ruling on a Rule 56 motion for summary judgment and the evidence included nothing more than the Court has described. But it should go without saying in the wake of Swierkiewicz that a heightened production burden at the summary judgment stage does not translate into a heightened pleading burden at the complaint stage. The majority rejects the complaint in this case because — in light of the fact that the parallel conduct alleged is consistent with ordinary market behavior — the claimed conspiracy is “conceivable” but not “plausible,” ante, at 570. I have my doubts about the majority’s assessment of the plausibility of this alleged conspiracy. See Part III, infra. But even if the majority’s speculation is correct, its “plausibility” standard is irreconcilable with Rule 8 and with our governing precedents. As we made clear in Swierkiewicz and Leatherman, fear of the burdens of litigation does not justify factual conclusions supported only by lawyers’ arguments rather than sworn denials or admissible evidence.
This case is a poor vehicle for the Court’s new pleading rule, for we have observed that “in antitrust cases, where ‘the proof is largely in the hands of the alleged conspirators,’ . . . dismissals prior to giving the plaintiff ample *587 opportunity for discovery should be granted very sparingly.” Hospital Building Co. v. Trustees of Rex Hospital, 425 U. S. 738, 746 (1976) (quoting Poller v. Columbia Broadcasting System, Inc., 368 U. S. 464, 473 (1962)); see also Knuth v. Erie-Crawford Dairy Cooperative Assn., 395 F. 2d 420, 423 (CA3 1968) (“The ‘liberal’ approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all the details and specific facts relied upon cannot properly be set forth as part of the pleadings”). Moreover, the fact that the Sherman Act authorizes the recovery of treble damages and attorney’s fees for successful plaintiffs indicates that Congress intended to encourage, rather than discourage, private enforcement of the law. See Radovich v. National Football League, 352 U. S. 445, 454 (1957) (“Congress itself has placed the private antitrust litigant in a most favorable position .... In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws”). It is therefore more, not less, important in antitrust cases to resist the urge to engage in armchair economics at the pleading stage.
The same year we decided Conley, Judge Clark wrote, presciently,
“I fear that every age must learn its lesson that special pleading cannot be made to do the service of trial and that live issues between active litigants are not to be disposed of or evaded on the paper pleadings, i. e., the formalistic claims of the parties. Experience has found no quick and easy short cut for trials in cases generally and antitrust cases in particular.” Special Pleading in the “Big Case”? in Procedure — The Handmaid of Justice 147, 148 (C. Wright & H. Reasoner eds. 1965) (hereinafter Clark, Special Pleading in the Big Case) (emphasis added).
*588 In this “Big Case,” the Court succumbs to the temptation that previous Courts have steadfastly resisted.[8] While the majority assures us that it is not applying any “‘heightened’ ” pleading standard, see ante, at 569, n. 14,1 shall now explain why I have a difficult time understanding its opinion any other way.
Ill
The Court does not suggest that an agreement to do what the plaintiffs allege would be permissible under the antitrust laws, see, e. g., Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U. S. 519, 526-527 (1983). Nor does the Court hold that these plaintiffs have failed to allege an injury entitling them to sue for damages under those laws, see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U. S. 477, 489-490 (1977). Rather, the theory on which the Court per *589 mits dismissal is that, so far as the Federal Rules are concerned, no agreement has been alleged at all. This is a mind-boggling conclusion.
As the Court explains, prior to the enactment of the Telecommunications Act of 1996 the law prohibited the defendants from competing with each other. The new statute was enacted to replace a monopolistic market with a competitive one. The Act did not merely require the regional monopolists to take affirmative steps to facilitate entry to new competitors, see Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U. S. 398, 402 (2004); it also permitted the existing firms to compete with each other and to expand their operations into previously forbidden territory. See 47 U. S. C. §271. Each of the defendants decided not to take the latter step. That was obviously an extremely important business decision, and I am willing to presume that each company acted entirely independently in reaching that decision. I am even willing to entertain the majority’s belief that any agreement among the companies was unlikely. But the plaintiffs allege in three places in their complaint, ¶¶ 4, 51, 64, App. 11, 27, 30, that the ILECs did in fact agree both to prevent competitors from entering into their local markets and to forgo competition with each other. And as the Court recognizes, at the motion to dismiss stage, a judge assumes “that all the allegations in the complaint are true (even if doubtful in fact).” Ante, at 555.
The majority circumvents this obvious obstacle to dismissal by pretending that it does not exist. The Court admits that “in form a few stray statements in the complaint speak directly of agreement,” but disregards those allegations by saying that “on fair reading these are merely legal conclusions resting on the prior allegations” of parallel conduct. Ante, at 564. The Court’s dichotomy between factual allegations and “legal conclusions” is the stuff of a bygone era, supra, at 574-576. That distinction was a defining feature of code pleading, see generally Clark, The Complaint in *590 Code Pleading, 35 Yale L. J. 259 (1925-1926), but was conspicuously abolished when the Federal Rules were enacted in 1938. See United States v. Employing Plasterers Assn, of Chicago, 347 U. S. 186, 188 (1954) (holding, in an antitrust case, that the Government’s allegations of effects on interstate commerce must be taken into account in deciding whether to dismiss the complaint “[w]hether these charges be called ‘allegations of fact’ or ‘mere conclusions of the pleader’ ”); Brownlee v. Conine, 957 F. 2d 353, 354 (CA7 1992) (“The Federal Rules of Civil Procedure establish a system of notice pleading rather than of fact pleading, . . . so the happenstance that a complaint is ‘eonclusory,’ whatever exactly that overused lawyers’ cliché means, does not automatically condemn it”); Walker Distributing Co. v. Lucky Lager Brewing Co., 323 F. 2d 1, 3-4 (CA9 1963) (“[O]ne purpose of Rule 8 was to get away from the highly technical distinction between statements of fact and conclusions of law... ”); Oil, Chemical & Atomic Workers Int’l Union v. Delta, 277 F. 2d 694, 697 (CA6 1960) (“Under the notice system of pleading established by the Rules of Civil Procedure,. .. the ancient distinction between pleading ‘facts’ and ‘conclusions’ is no longer significant”); 5 Wright & Miller § 1218, at 267 (“[T]he federal rules do not prohibit the pleading of facts or legal conclusions as long as fair notice is given to the parties”). “Defendants entered into a contract” is no more a legal conclusion than “defendant negligently drove,” see Form 9; supra, at 575-576. Indeed it is less of one.[9]
*591 Even if I were inclined to accept the Court’s anachronistic dichotomy and ignore the complaint’s actual allegations, I would dispute the Court’s suggestion that any inference of agreement from petitioners’ parallel conduct is “implausible.” Many years ago a truly great economist perceptively observed that “[pjeople of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices.” A. Smith, An Inquiry Into the Nature and Causes of the Wealth of Nations, in 39 Great Books of the Western World 55 (R. Hutchins & M. Adler eds. 1952). I am not so cynical as to accept that sentiment at face value, but I need not do so here. Respondents’ complaint points not only to petitioners’ numerous opportunities to meet with each other, Complaint ¶ 46, App. 23,[10] but also to Notebaert’s curious statement that encroaching on a fellow incumbent’s territory “might be a good way to turn a quick dollar but that doesn’t make it right,” id., ¶ 42, App. 22. What did he mean by that? One possible (indeed plausible) inference is that he meant that while it would be in his company’s economic self-interest to compete with its brethren, he had agreed with his competitors not to do so. According to the complaint, that is how the Illinois Coalition for Competitive Telecom construed Notebaert’s statement, id., ¶ 44, App. 22 (calling the statement “evidence of potential collusion among regional Bell phone monopolies to not com *592 pete against one another and kill off potential competitors in local phone service”), and that is how Members of Congress construed his company’s behavior, id., ¶ 45, App. 23 (describing a letter to the Justice Department requesting an investigation into the possibility that the ILECs’ “ ‘very apparent non-competition policy’ ” was coordinated).
Perhaps Notebaert meant instead that competition would be sensible in the short term but not in the long run. That’s what his lawyers tell us anyway. See Brief for Petitioners 36. But I would think that no one would know better what Notebaert meant than Notebaert himself. Instead of permitting respondents to ask Notebaert, however, the Court looks to other quotes from that and other articles and decides that what he meant was that entering new markets as a competitive local exchange carrier would not be a “ ‘sustainable economic model.’ ” Ante, at 568, n. 13. Never mind that— as anyone ever interviewed knows — a newspaper article is hardly a verbatim transcript; the writer selects quotes to package his story, not to record a subject’s views for posterity. But more importantly the District Court was required at this stage of the proceedings to construe Notebaert’s ambiguous statement in the plaintiffs’ favor.[11] See Allen v. Wright, 468 U. S. 737, 767-768, n. 1 (1984) (Brennan, J., dissenting). The inference the statement supports — that simultaneous decisions by ILECs not even to attempt to poach customers from one another once the law authorized them to *593 do so were the product of an agreement — sits comfortably within the realm of possibility. That is all the Rules require.
To be clear, if I had been the trial judge in this case, I would not have permitted the plaintiffs to engage in massive discovery based solely on the allegations in this complaint. On the other hand, I surely would not have dismissed the complaint without requiring the defendants to answer the charge that they “have agreed not to compete with one another and otherwise allocated customers and markets to one another.”[12] Complaint, ¶ 51, App. 27. Even a sworn denial of that charge would not justify a summary dismissal without giving the plaintiffs the opportunity to take depositions from Notebaert and at least one responsible executive representing each of the other defendants.
Respondents in this case proposed a plan of “ ‘phased discovery’” limited to the existence of the alleged conspiracy and class certification. Brief for Respondents 25-26. Two petitioners rejected the plan. Ibid. Whether or not respondents’ proposed plan was sensible, it was an appropriate subject for negotiation.[13] Given the charge in the com *594 plaint — buttressed by the common sense of Adam Smith— I cannot say that the possibility that joint discussions and perhaps some agreements played a role in petitioners’ decisionmaking process is so implausible that dismissing the complaint before any defendant has denied the charge is preferable to granting respondents even a minimal opportu *595 nity to prove their claims. See Clark, New Federal Rules 977 (“[Tjhrough the weapons of discovery and summary judgment we have developed new devices, with more appropriate penalties to aid in matters of proof, and do not need to force the pleadings to their less appropriate function”).
I fear that the unfortunate result of the majority’s new pleading rule will be to invite lawyers’ debates over economic theory to conclusively resolve antitrust suits in the absence of any evidence. It is no surprise that the antitrust defense bar — among whom “lament” as to inadequate judicial supervision of discovery is most “common,” see ante, at 559 — should lobby for this state of affairs. But “we must recall that their primary responsibility is to win cases for their clients, not to improve law administration for the public.” Clark, Special Pleading in the Big Case 152. As we did in our prior decisions, we should have instructed them that their remedy was to seek to amend the Federal Rules— not our interpretation of them.[14] See Swierkiewicz, 534 U. S., at 515; Crawford-El v. Britton, 523 U. S. 574, 595 (1998); Leatherman, 507 U. S., at 168.
IV
Just a few weeks ago some of my colleagues explained that a strict interpretation of the literal text of statutory lan *596 guage is essential to avoid judicial decisions that are not faithful to the intent of Congress, Zuni Public School Dist. No. 89 v. Department of Education, ante, p. 108 (Scalia, J., dissenting). I happen to believe that there are cases in which other tools of construction are more reliable than text, but I agree of course that congressional intent should guide us in matters of statutory interpretation. Ante, at 106 (Stevens, J., concurring). This is a case in which the intentions of the drafters of three important sources of law — the Sherman Act, the Telecommunications Act of 1996, and the Federal Rules of Civil Procedure — all point unmistakably in the same direction, yet the Court marches resolutely the other way. Whether the Court’s actions will benefit only defendants in antitrust treble-damages cases, or whether its test for the sufficiency of a complaint will inure to the benefit of all civil defendants, is a question that the future will answer. But that the Court has announced a significant new rule that does not even purport to respond to any congressional command is glaringly obvious.
The transparent policy concern that drives the decision is the interest in protecting antitrust defendants — who in this case are some of the wealthiest corporations in our economy — from the burdens of pretrial discovery. Ante, at 558-560. Even if it were not apparent that the legal fees petitioners have incurred in arguing the merits of their Rule 12(b) motion have far exceeded the cost of limited discovery, or that those discovery costs would burden respondents as well as petitioners,[15] that concern would not provide an adequate justification for this law-changing decision. For in the final analysis it is only a lack of confidence in the ability of trial judges to control discovery, buttressed by appellate judges’ independent appraisal of the plausibility of pro *597 foundly serious factual allegations, that could account for this stark break from precedent.
If the allegation of conspiracy happens to be true, today’s decision obstructs the congressional policy favoring competition that undergirds both the Telecommunications Act of 1996 and the Sherman Act itself. More importantly, even if there is abundant evidence that the allegation is untrue, directing that the case be dismissed without even looking at any of that evidence marks a fundamental — and unjustified— change in the character of pretrial practice.
Accordingly, I respectfully dissent.

 See 9 W. Holdsworth, History of English Law 324-327 (1926).

 Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U. S. 271, 283 (1988).

 The Federal Rules do impose a “particularity” requirement on “all averments of fraud or mistake,” Fed. Rule Civ. Proc. 9(b), neither of which has been alleged in this case. We have recognized that the canon of ex-presio unius est exclusio alterius applies to Rule 9(b). See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U. S. 163, 168 (1993).

 SEC v. Zandford, 535 U. S. 813, 818 (2002); Davis v. Monroe County Bd. of Ed., 526 U. S. 629, 654 (1999); Hartford Fire Ins. Co. v. California, 509 U. S. 764, 811 (1993); Brower v. County of Inyo, 489 U. S. 593, 598 (1989); Hughes v. Rowe, 449 U. S. 5, 10 (1980) (per curiam); McLain v. Real Estate Bd. of New Orleans, Inc., 444 U. S. 232, 246 (1980); Estelle v. Gamble, 429 U. S. 97, 106 (1976); Hospital Building Co. v. Trustees of Rex Hospital, 425 U. S. 738, 746 (1976); Scheuer v. Rhodes, 416 U. S. 232, 236 (1974); Cruz v. Beto, 405 U. S. 319, 322 (1972) (per curiam); Haines v. Kerner, 404 U. S. 519, 521 (1972) (per curiam); Jenkins v. McKeithen, 395 U. S. 411, 422 (1969) (plurality opinion); see also Cleveland Bd. of Ed. v. Loudermill, 470 U. S. 532, 554 (1985) (Brennan, J., concurring in part and *578 dissenting in part); Hoover v. Ronwin, 466 U. S. 558, 587 (1984) (Stevens, J., dissenting); United Air Lines, Inc. v. Evans, 431 U. S. 553, 561, n. 1 (1977) (Marshall, J., dissenting); Simon v. Eastern Ky. Welfare Rights Organization, 426 U. S. 26, 55, n. 6 (1976) (Brennan, J., concurring in judgment).

 See, e. g., EB Invs., LLC v. Atlantis Development, Inc., 930 So. 2d 502, 507 (Ala. 2005); Department of Health & Social Servs. v. Native Village of Curyung, 151 P. 3d 388, 396 (Alaska 2006); Newman v. Maricopa Cty., 167 Ariz. 501, 503, 808 P. 2d 1253, 1255 (App. 1991); Public Serv. Co. of Colo. v. Van Wyk, 27 P. 3d 377, 385-386 (Colo. 2001) (en banc); Clawson v. St. Louis Post-Dispatch, LLC, 906 A. 2d 308, 312 (D. C. 2006); Hillman Constr. Corp. v. Wainer, 636 So. 2d 576, 578 (Fla. App. 1994); Kaplan v. Kaplan, 266 Ga. 612, 613, 469 S. E. 2d 198, 199 (1996); Wright v. Home Depot U. S. A, Inc., 111 Haw. 401, 406, 142 P. 3d 265, 270 (2006); Taylor v. Maile, 142 Idaho 253, 257, 127 P. 3d 156, 160 (2005); Fink v. Bryant, 2001-CC-0987, p. 4 (La. 11/28/01), 801 So. 2d 346, 349; Gagne v. Cianbro Corp., 431 A. 2d 1313, 1318-1319 (Me. 1981); Gasior v. Massachusetts Gen. Hospital, 446 Mass. 645, 647, 846 N. E. 2d 1133, 1135 (2006); Ralph Walker, Inc. v. Gallagher, 926 So. 2d 890, 893 (Miss. 2006); Jones v. Montana Univ. System, 337 Mont. 1, 7, 155 P. 3d 1247, 1252 (2007); Johnston v. Nebraska Dept. of Correctional Servs., 270 Neb. 987, 989, 709 N. W. 2d 321, 324 (2006); Blackjack Bonding v. Las Vegas Munic. Ct., 116 Nev. 1213, 1217, 14 P. 3d 1275, 1278 (2000); Shepard v. Ocwen Fed. Bank, 361 N. C. 137, 139, 638 S. E. 2d 197, 199 (2006); Rose v. United Equitable Ins. Co., 2001 ND 154, ¶ 10,632 N. W. 2d 429, 434; State ex rel. Turner v. Houk, 112 Ohio St. 3d 561, 562, 2007-Ohio-814, ¶5, 862 N. E. 2d 104, 105 (per curiam); Moneypenney v. Dawson, 2006 OK 53, ¶ 2, 141 P. 3d 549, 551; Gagnon v. State, 570 A. 2d 656, 659 (R. I.1990); Osloond v. Farrier, 2003 SD 28, ¶ 4, 659 N. W. 2d 20, 22 (per curiam); Smith v. Lincoln Brass Works, Inc., 712 S. W. 2d 470, 471 (Tenn. 1986); Association of Haystack Property Owners, Inc. v. Sprague, 145 Vt. 443, 446, 494 A. 2d 122, 124 (1985); In re Coday, *579 156 Wash. 2d 485, 497, 130 P. 3d 809, 815 (2006) (en banc); Haines v. Hampshire Cty. Comm’n, 216 W. Va. 499, 502, 607 S. E. 2d 828, 831 (2004); Warren v. Hart, 747 P. 2d 511, 512 (Wyo. 1987); see also Malpiede v. Townson, 780 A. 2d 1075, 1082-1083 (Del. 2001) (permitting dismissal only “where the court determines with reasonable certainty that the plaintiff could prevail on no set of facts that may be inferred from the well-pleaded allegations in the complaint” (internal quotation marks omitted)); Canel v. Topinka, 212 Ill. 2d 311, 318, 818 N. E. 2d 311, 317 (2004) (replacing “appears beyond doubt” in the Conley formulation with “is clearly apparent”); In re Young, 522 N. E. 2d 386, 388 (Ind. 1988) (per curiam) (replacing “appears beyond doubt” with “appears to a certainty”); Barkema v. Williams Pipeline Co., 666 N. W. 2d 612, 614 (Iowa 2003) (holding that a motion to dismiss should be sustained “only when there exists no conceivable set of facts entitling the non-moving party to relief”); Pioneer Village v. Bullitt Cty., 104 S. W. 3d 757, 759 (Ky. 2003) (holding that judgment on the pleadings should be granted “if it appears beyond doubt that the nonmoving party cannot prove any set of facts that would entitle him/her to relief”); Corley v. Detroit Bd. of Ed., 470 Mich. 274, 277, 681 N. W. 2d 342, 345 (2004) (per curiam) (holding that a motion for judgment on the pleadings should be granted only “ ‘if no factual development could possibly justify recovery’ ”); Oberkramer v. EUisville, 706 S. W. 2d 440, 441 (Mo. 1986) (en banc) (omitting the words “beyond doubt” from the Conley formulation); Colman v. Utah State Land Bd., 795 P. 2d 622, 624 (Utah 1990) (holding that a motion to dismiss is appropriate “only if it clearly appears that [the plaintiff] can prove no set of facts in support of his claim”); NRC Management Servs. Corp. v. First Va. Bank-Southwest, 63 Va. Cir. 68, 70 (2003) (“The Virginia standard is identical [to the Conley formulation], though the Supreme Court of Virginia may not have used the same words to describe it”).

 The majority is correct to say that what the Federal Rules require is a “ ‘showing’ ” of entitlement to relief. Ante, at 555, n. 3. Whether and to what extent that “showing” requires allegations of fact will depend on the particulars of the claim. For example, had the amended complaint in this case alleged only parallel conduct, it would not have made the required “showing.” See supra, at 570-571. Similarly, had the pleadings contained only an allegation of agreement, without specifying the nature or object of that agreement, they would have been susceptible to the charge that they did not provide sufficient notice that the defendants may answer intelligently. Omissions of that sort instance the type of “bareness” with which the Federal Rules are concerned. A plaintiff’s inability to persuade a district court that the allegations actually included in her complaint are “plausible” is an altogether different kind of failing, and one that should not be fatal at the pleading stage.

 See also 5 Wright & Miller § 1202, at 89-90 (“[PJleadings under the rules simply may be a general summary of the party’s position that is sufficient to advise the other party of the event being sued upon, to provide some guidance in a subsequent proceeding as to what was decided for purposes of res judicata and collateral estoppel, and to indicate whether the case should be tried to the court or to a jury. No more is demanded of the pleadings than this; indeed, history shows that no more can be performed successfully by the pleadings” (footnotes omitted)).

 Our decision in Dura Pharmaceuticals, Inc. v. Broudo, 544 U. S. 336 (2005), is not to the contrary. There, the plaintiffs failed adequately to allege loss causation, a required element in a private securities fraud action. Because it alleged nothing more than that the prices of the securities the plaintiffs purchased were artificially inflated, the Dura complaint failed to “provid[e] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation.” Id., at 347. Here, the failure the majority identifies is not a failure of notice — which “notice pleading” rightly condemns — but rather a failure to satisfy the Court that the agreement alleged might plausibly have occurred. That being a question not of notice but of proof, it should not be answered without first hearing from the defendants (as apart from their lawyers).
Similarly, in Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U. S. 519 (1983), in which we also found an antitrust complaint wanting, the problem was not that the injuries the plaintiffs alleged failed to satisfy some threshold of plausibility, but rather that the injuries as alleged were not “the type that the antitrust statute was intended to forestall.” Id., at 540; see id., at 526 (“As the case comes to us, we must assume that the Union can prove the facts alleged in its amended complaint. It is not, however, proper to assume that the Union can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged”).

 The Court suggests that the allegation of an agreement, even if credited, might not give the notice required by Rule 8 because it lacks specificity. Ante, at 565, n. 10. The remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a Rule 12(e) motion for a more definite statement. See Swierkiewicz v. Sorema N. A, 534 U. S. 506, 514 (2002). Petitioners made no such motion and indeed have conceded that “[o]ur problem with the current complaint is not a lack of specificity, it’s quite specific.” Tr. of Oral Arg. 14. Thus, the fact that “the pleadings mentioned no specific time, place, or persons involved in the alleged conspiracies,” ante, at 565, n. 10, is, for our purposes, academic.

 The Court describes my reference to the allegation that the defendants belong to various trade associations as “playfully” suggesting that the defendants conspired to restrain trade. Ante, at 567, n. 12. Quite the contrary: An allegation that competitors meet on a regular basis, like the allegations of parallel conduct, is consistent with — though not sufficient to prove — the plaintiffs’ entirely serious and unequivocal allegation that the defendants entered into an unlawful agreement. Indeed, if it were true that the plaintiffs “rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs,” ante, at 564, there would have been no purpose in including a reference to the trade association meetings in the amended complaint.

 It is ironic that the Court seeks to justify its decision to draw factual inferences in the defendants’ favor at the pleading stage by citing to a rule of evidence, ante, at 568, n. 13. Under Federal Rule of Evidence 201(b), a judicially noticed fact “must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.” Whether Notebaert's statements constitute evidence of a conspiracy is hardly beyond reasonable dispute.

 The Court worries that a defendant seeking to respond to this “conclusory” allegation “would have little idea where to begin.” Ante, at 565, n. 10. A defendant could, of course, begin by either denying or admitting the charge.

 The potential for “sprawling, costly, and hugely time-consuming” discovery, ante, at 560, n. 6, is no reason to throw the baby out with the bathwater. The Court vastly underestimates a district court’s case-management arsenal. Before discovery even begins, the court may grant a defendant’s Rule 12(e) motion; Rule 7(a) permits a trial court to order a plaintiff to reply to a defendant’s answer, see Crawford-El v. Britton, 523 U. S. 574, 598 (1998); and Rule 23 requires “rigorous analysis” to ensure that class certification is appropriate, General Telephone Co. of Southwest v. Falcon, 457 U. S. 147, 161 (1982); see In re Initial Public Offering Securities Litigation, 471 F. 3d 24 (CA2 2006) (holding that a district court may not certify a class without ruling that each Rule 23 requirement is met, even if a requirement overlaps with a merits issue). Rule 16 invests a trial judge with the power, backed by sanctions, to regulate pretrial *594 proceedings via conferences and scheduling orders, at which the parties may discuss, inter alia, “the elimination of frivolous claims or defenses,” Rule 16(c)(1); “the necessity or desirability of amendments to the pleadings,” Rule 16(c)(2); “the control and scheduling of discovery,” Rule 16(c)(6); and “the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems,” Rule 16(c)(12). Subsequently, Rule 26 confers broad discretion to control the combination of interrogatories, requests for admissions, production requests, and depositions permitted in a given case; the sequence in which such discovery devices may be deployed; and the limitations imposed upon them. See 523 U. S., at 598-599. Indeed, Rule 26(c) specifically permits a court to take actions “to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense” by, for example, disallowing a particular discovery request, setting appropriate terms and conditions, or limiting its scope.
In short, the Federal Rules contemplate that pretrial matters will be settled through a flexible process of give and take, of proffers, stipulations, and stonewalls, not by having trial judges screen allegations for their plausibility vel non without requiring an answer from the defendant. See Societe Internationale pour Participations Industrielles et Commerciales, S. A. v. Rogers, 357 U. S. 197, 206 (1958) (“Rule 34 is sufficiently flexible to be adapted to the exigencies of particular litigation”). And should it become apparent over the course of litigation that a plaintiff’s filings bespeak an in terrorem suit, the district court has at its call its own in terrorem device, in the form of a wide array of Rule 11 sanctions. See Rules 11(b), (c) (authorizing sanctions if a suit is presented ‘Tor any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation”); see Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., 498 U. S. 533 (1991) (holding that Rule 11 applies to a represented party who signs a pleading, motion, or other papers, as well as to attorneys); Atkins v. Fischer, 232 F. R. D. 116, 126 (DC 2005) (“As possible sanctions pursuant to Rule 11, the court has an arsenal of options at its disposal”).

 Given his “background in antitrust law,” ante, at 560, n. 6, Judge Easterbrook has recognized that the most effective solution to discovery abuse lies in the legislative and rulemaking arenas. He has suggested that the remedy for the ills he complains of requires a revolution in the rules of civil procedure:
“Perhaps a system in which judges pare away issues and focus [on] investigation is too radical to contemplate in this country — although it prevailed here before 1938, when the Federal Rules of Civil Procedure were adopted. The change could not be accomplished without abandoning notice pleading, increasing the number of judicial officers, and giving them more authority.... If we are to rule out judge-directed discovery, however, we must be prepared to pay the piper. Part of the price is the high cost of unnecessary discovery — impositional and otherwise.” Discovery as Abuse, 69 B. U. L. Rev. 635, 645 (1989).

 It would be quite wrong, of course, to assume that dismissal of an antitrust case after discovery is costless to plaintiff's. See Fed. Rule Civ. Proc. 54(d)(1) (“[C]osts other than attorneys’ fees shall be allowed as of course to the prevailing party unless the court .otherwise directs”).